UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

iROBOT CORP.,                    )
    Plaintiff,                   )
                               )
    v.                           ) Civil Action No. 07cv11611-NG
                               )
JAMEEL AHED,                     )
ROBOTIC FX, INC.,                )
    Defendants.                  )

TABLE OF CONTENTS
MEMORANDUM AND ORDER RE: PRELIMINARY INJUNCTION
November 2, 2007

I.   BACKGROUND AND PROCEDURAL HISTORY . . . . . . . . . . . -3-
        A.  Employment at iRobot and Confidentiality Agreement
           . . . . . . . . . . . . . . . . . . . . -4-
        B.  Work on the PackBot . . . . . . . . . . . . -5-
        C.  Leaving iRobot to Start Robotic FX . . . . . . -5-
        D.  Robotics FX and the Negotiator . . . . . . . . -8-
        E.  iRobot and Robotic FX . . . . . . . . . . . -9-
        F.  Litigation Begins . . . . . . . . . . . . . -10-
        G.  Ahed's Spoliation of the Evidence . . . . . -10-
        H.  Army Sets Aside the Award . . . . . . . . . -14-

II.  LEGAL STANDARDS . . . . . . . . . . . . . . . . . -15-

III. IROBOT'S REASONABLE LIKELIHOOD OF SUCCESS ON THE MERITS ON
     THE TRADE SECRETS CLAIM [REDACTED IN PUBLIC DOCUMENT] -19-

IV.  THE REMAINING PRELIMINARY INJUNCTION FACTORS . . . . . -19-
        A.  The Potential for Irreparable Harm to the
           Plaintiffs . . . . . . . . . . . . . . . . -19-
        B.  The Balancing of the Harms Between the Plaintiff
           and the Defendant . . . . . . . . . . . . . -21-
        C.  The Public Interest . . . . . . . . . . . . -23-
        D.  The United States' Interest . . . . . . . . . -24-
              1.  Jurisdiction to Enter an Injunction
                 Pertaining to a Government Contract
                 . . . . . . . . . . . . . . . . -24-
              2.  The Importance of Obtaining Functioning
                 Robots as Quickly as Possible . . -28-

V.   THE SCOPE OF THE INJUNCTION . . . . . . . . . . . . -29-

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| iROBOT CORP., | ) |
|     Plaintiff, | ) |
| | ) |
|     v. | ) Civil Action No. 07cv11611-NG |
| | ) |
| JAMEEL AHED, | ) |
| ROBOTIC FX, INC., | ) |
|     Defendants. | ) |

## MEMORANDUM AND ORDER RE: PRELIMINARY INJUNCTION
November 2, 2007

Plaintiff iRobot Corporation ("iRobot") brought suit in Massachusetts state court, seeking damages and injunctive relief for defendants' alleged misappropriation of trade secrets. Specifically, iRobot charges that after quitting his position as an iRobot engineer, defendant Jameel Ahed ("Ahed"), the founder and sole shareholder of defendant Robotic FX, Inc. ("Robotic FX"), retained and used trade secrets contained in the plaintiff's PackBot robot. According to the plaintiff, Ahed and Robotic FX used those trade secrets to develop a competing product, the Negotiator. Defendants removed to this Court, where diversity jurisdiction properly exists. See Notice of Removal (document # 1). Subsequently, iRobot moved for a preliminary injunction (document # 5).

This Court held a hearing on the Motion over four days. Portions of the hearing dealt with the trade secrets that iRobot claimed the defendant stole. As such, they were sealed from public view. Since this memorandum refers to both the

sealed and unsealed parts of the transcript, parts of the opinion will likewise be redacted for the public record.

Broadly speaking, the parties tell two stories.  iRobot describes how it developed the Packbot in a painstaking process over a period of time.  It contends that while an iRobot employee, Ahed took the trade secrets that he had learned concerning the Packbot and later unlawfully used them to benefit the company he founded and owns, iRobot's competitor, Robotic FX.  Robotic FX contends that it developed the Negotiator through Ahed's efforts and Ahed's efforts alone.  In its view, Ahed was a brilliant young engineer making leaps through logic and luck to arrive at a similar, if not identical, product.

On the surface, this would not be an easy case for preliminary injunctive relief for several reasons.  To obtain a preliminary injunction, a plaintiff must prove that it is "reasonably likely to succeed on the merits" of its claim, that it would be irreparably harmed if relief is not granted, and that the balance of harms favor injunctive relief.  In this case, to predict who is likely to succeed on the merits requires a careful examination of the Packbot in comparison with the Negotiator, a daunting task on a truncated record.

But this is an unusual situation:  Ahed's behavior both before and after he was sued was highly suspect and, as

described below, surely tips the balance in favor of iRobot. Ahed has admitted that he discarded certain physical items, destroyed electronic data, and attempted to hide other information, all of which presumptively had relevance to this case. These actions took place not just <u>after</u> Ahed was sued, but <u>after</u> he was ordered by a court to preserve evidence. His spoilation of evidence, along with other acts in which Ahed engaged just before he left iRobot, gives rise to a strong inference of consciousness of guilt. At the very minimum, it profoundly undermines Ahed's credibility as a witness. Since he was Robotic FX's principal witness with respect to how the Negotiator was developed, the impact is devastating: The Court rejects his account and credits iRobot's.

The Court will therefore **GRANT IN PART** Plaintiff's Motion for a Preliminary Injunction (document # 5).

The Court will first address Ahed's actions prior to the preliminary injunction hearing, since they frame the credibility determinations the Court must make. The evidence of trade secret violations will then be addressed.

## I.    <u>BACKGROUND AND PROCEDURAL HISTORY</u>

The parties call the machines at the core of this case "tactical robots." They are designed to do dangerous work without placing humans in harm's way -- in this case, to detect and disable improvised explosive devices ("IEDs") and other

traps.  According to iRobot, its PackBot has already been so employed in Afghanistan.  Aff. of Timothy Ohm ("Ohm Aff.") ¶¶ 4-5 (document # 13); Transcript of Preliminary Injunction Hearing ("Tr.") at 275.

A.    **Employment at iRobot and Confidentiality Agreement**

Ahed was first employed by iRobot in 1999[1] as a summer intern while he was still in college.  He signed a number of confidentiality agreements. (1) The first was on beginning his internship on May 25, 1999.  Exh. "B" to Aff. of Thomas Halkowski ("Halkowski Aff.") (document # 5-3).  (2) The second was on August 20, 1999, upon leaving the company to return to school.  This agreement forbade him from disclosing confidential information, including trade secrets.  Exh. "C" to Halkowski Aff. (document # 5-3).  (3) After his graduation, Ahed took a full-time position at iRobot and signed another confidentiality agreement on July 10, 2000.  Exh. "D" to Halkowski Aff. (document # 5-3).  He gave notice he was leaving iRobot on June 4, 2002, and officially departed on June 21. (4) The day he left, Ahed signed yet another agreement to preserve "all trade secrets, confidential information, [or] knowledge . . . relating to products, processes, know-how, designs . . . or other subject matter pertaining to any

---

[1] iRobot was then named IS Robotics.

-4-

business of [iRobot]."  Exh. "E" to Halkowski Aff. (document #
5-3).

**B.    Work on the PackBot**

While at iRobot, Ahed did some work on the PackBot
project.  Indeed, by 2002, he was the only electrical engineer
assigned to the PackBot project in iRobot's Somerville,
Massachusetts office.  See Tr. at 170.  Ahed was also a member
of the "Tactical Mobile Robot" ("TMR") and "Military Systems"
("MilSys") mailing lists.  Joint Stipulation (document # 45).
Due to his membership on those mailing lists, it is reasonable
to infer that he would have received a number of emails
detailing technical problems with the PackBot's features, as
well as explanations of the solutions.  See Exhs. 22 and 23
(emails to the TMR mailing list discussing Timothy Ohm's
solution for creating the tracks on the PackBot).  Ahed would
also have had access to the iRobot central computer server,
though it is unclear precisely what documents were stored
there.

**C.    Leaving iRobot to Start Robotic FX**

By 2002, however, Ahed was clearly disillusioned with
working at iRobot.  In approximately December 2001, six months
before he left, Ahed registered a new domain name,
"www.roboticfx.com," which he intended to be the internet
presence of his own robotics company.  Tr. at 175.  On May 30,

2002, at 1:10 pm, a few days before he announced his resignation, he sent an email to his friend, Scott Pratt, which clearly suggests that his mind was made up to leave the company.  He wrote, "I have been going over it and over it and over it . . . I think this is the right thing for me to do." Email from Jameel Ahed, iRobot, to Scott Pratt, iRobot (May 30, 2002, 13:09:48 EDT), Exh. 16 (ellipsis in original) (admitted at hearing).

   Significantly, that same day -- notwithstanding his emails to Pratt announcing his intention to leave iRobot -- Ahed sent another email to Mike Ciholas, a contractor for iRobot, seeking a copy of the full electrical schematics for the PackBot.  He wrote, "I want to have a copy of the 'full stack release.'  You had mentioned how you have a zip file or something that contains all the information on how to build a full stack from the schematics, layouts, to full bom [bill of materials]." Email from Jameel Ahed, iRobot, to Mike Ciholas (May 30, 2002, 09:01:12 EDT), Exh. "B" to Second Aff. of Tom Frost ("Frost Aff.") (document # 15).  The same day, after writing to Pratt, Ahed also wrote to his supervisor, Tom Frost, asking him to provide authorization for the files.  See Email from Jameel Ahed, iRobot, to Tom Frost, iRobot (May 30, 2002, 20:47:19 EDT), Exh. "C" to Frost Aff. (document # 15).  Frost, knowing nothing about Ahed's intentions, nevertheless demurred.  He was

uncertain, however, as to whether such a request would be legitimately within the scope of Ahed's work as an electrical engineer assigned to the PackBot project.  Tr. at 320-24.  Ahed testified, though, that he "never received any schematic information in response" to the emails.  Declaration of Jameel Ahed ¶ 9 ("Ahed Decl.") (document # 29).

After the May 30 emails, Ahed and Frost met to discuss Ahed's concerns that he was being given insufficient access to information, which he stated prevented him from doing his work efficiently.  See id. ¶¶ 7-9.  Ahed also told Frost that he wanted a raise.  Id. ¶ 9.  Frost told Ahed that he could not have a raise, nor the full access to design schemata that he wanted.  While Ahed testified that those refusals were merely the "last straw," Tr. at 170, the Court does not find his testimony credible.  The handwriting was on the wall long before; he was on his way out the door.

Approximately a week later, on June 4, Ahed submitted his notice of resignation.  On June 6, although he was still employed at iRobot, he wrote in another email, "I am starting a robotics engineering design company. . . . I already have 5 employees!  And they are working soo [sic] hard already!"  Email from Jameel Ahed, iRobot, to Daria Moore, Emerging Acct. Mgr., Cilicon (June 6, 2002, 17:14:36 EDT), Exh. "D" to Frost Aff. (document # 15).  On June 22, 2002, the day after Ahed

officially left iRobot, "someone" accessed his iRobot email
account via a web-based email application and forwarded at
least one email to another account of his: ahed@roboticfx.com.
See Email from Jameel Ahed, iRobot, to Jameel Ahed, Robotic FX
(June 22, 2002, 22:16:54 EDT), Exh. "E" to Frost Aff. (document
# 15).  That email contained technical information about the
batteries of the PackBot.  While Ahed denies forwarding the
email, see Joint Stipulation ¶ 1 (document # 45), the record,
again, strongly suggests otherwise.

   D.   **Robotics FX and the Negotiator**

   After Ahed left iRobot, he continued to do some contract
work for the company and designed other electronics modules.
He also continued work on a robotics project he had started in
college.  iRobot, interested in purchasing the rights to it,
made Ahed an offer, but he turned it down.  Ahed Decl. ¶ 4
(document # 29).

   In 2003, Ahed decided to convert the project into one more
appropriate for use as a "police robot."  In less than a year,
that robot became the Robotic FX Negotiator.  See id. ¶¶ 13-14.
The Negotiator was publicly displayed at a trade show in April
2004, and occasionally at other trade shows thereafter.  Id. ¶
15.  In approximately September 2005, iRobot became aware of
the Negotiator for the first time.  See Tr. at 302-04.

### E.    iRobot and Robotic FX

In December 2006, iRobot used a third party to acquire a
Negotiator robot.  Id. at 306.  Its engineers disassembled and
analyzed the machine, and concluded that iRobot proprietary
information may have been used.  On February 7, 2007, iRobot's
counsel sent a letter to Ahed warning him of possible
litigation over the Negotiator due to the alleged patent
infringements.  The letter demanded that Ahed and Robotic FX
immediately stop "all manufacturing, marketing, sales and
distribution activity with respect to the infringing robot."
Letter from Gilbert Hennessey, Fish & Richardson, P.C., to
Jameel Ahed, Robotic FX (Feb. 7, 2007), Exh. "E" to Compl.
(document # 1-2).

By late summer 2007, iRobot and Robotic FX were competing
for a lucrative military contract through the "XBot"
Competition.  The competition consisted of two phases:  First,
a technical test, an obstacle course through which the robots
maneuvered; and second, a reverse auction to determine the
lowest bidder.  The Negotiator passed the first phase, as did
two different robots made by iRobot, including the PackBot.
Robotic FX won the reverse auction, bidding $285 million to
iRobot's $286 million.  Tr. at 286.  The contract was awarded
to Robotic FX on September 14, 2007.

## F.  **Litigation Begins**

By that time, however, iRobot had already filed two lawsuits: the instant case -- originally filed in Suffolk County Superior Court -- alleging misappropriation of trade secrets under Massachusetts law, and another case claiming patent infringement, currently pending in federal district court for the Northern District of Alabama.  The suits were simultaneously filed on August 17, 2007.[2]

## G.  **Ahed's Spoliation of the Evidence**

Ahed received the complaints for each suit the same day they were filed, Friday, August 17, but professed not to have read them -- a claim that strains credulity.  Tr. at 230-31. His actions from that point on are nothing short of extraordinary:

1.  On the evening of August 17, Ahed began gathering "material to dispose of" at his office, including approximately 100 backup and archival CD-ROMs containing electronic copies of iterated designs of the Negotiator.  Id. at 233.  He also took three external hard drives, similarly used as archives for Robotic FX designs.  Id.  Ahed characterized the iRobot material that he was discarding as "memorabilia," id. at 237, a statement belied by the timing of his actions and the nature

---

[2] As of the date of this Order, there is a pending motion to transfer that litigation to this district for consolidation before this Court.

of the material.  According to his testimony, Ahed also threw
away a welding implement as "garbage," see id. at 523, despite
the fact that he discarded no other "garbage" at the same time
-- only other materials apparently related to iRobot's claims.
Id. at 237-38.

Ahed placed all of the items in a large green duffel bag
and carried it to a car owned by the Chief Operations Officer
of Robotic FX, Kim Hill.  See id. at 238.  Ahed could not
recall anything else that happened the night of August 17,
admitting that he had "a gap" in his memory.  Id. at 239.

2.  The following day, Saturday, August 18, Ahed and Hill
drove to an office supply store, where they purchased a heavy-
duty shredder.  On the way back from that store, they stopped
at a dumpster near Hill's apartment.  Ahed took the materials
out of the duffel bag and placed them in the dumpster.  On the
witness stand, surveying the items he allegedly disposed of,
Ahed agreed that he had discarded all of the items but one:
Exhibit 7, a molding fixture used to make an important
component of the Negotiator -- and one as to which iRobot
claims a trade secret.  According to Ahed, the fixture, a
three- or four-pound piece of aluminum, was "planted."  Id. at
211.  Not a shred of evidence supports the claim and indeed,
all inferences are to the contrary.  Ahed also stated that he
did not know how two tracks, apparently from robots, made it

into the dumpster.  Id. at 253-54, 551-52.  It took
approximately "three or four" trips from the car to the
dumpster to dispose of all of the material.  Id. at 256.

    3.  Significantly, Ahed did not place the CD-ROMs with
old Negotiator designs in the dumpster.  These he destroyed.
Upon arriving at Hill's apartment, Ahed began shredding the CD-
ROMs.  At some point during the shredding, the shredder jammed.
Ahed returned to the office supply store and purchased another.
On his way, he discarded the first shredder, but he did not do
so in Hill's domestic garbage or in the same dumpster where he
had placed the other items.  Id. at 240-41.  He then shredded
the remainder of the CD-ROMs.

    4.  Ahed was not finished.  While at the office supply
store, he had also purchased a "drive scrubber" program,
advertised to completely and securely erase data.  Later on
August 18, he used the program to obliterate the data stored on
a laptop that he had owned since the time of his employment at
iRobot.  He did so with the express intent of irremediably
rendering unreadable any data that had been on the hard drive.
Id. at 241-43.  On Monday morning, August 20, Ahed returned to
the offices of Robotic FX, and used the drive scrubber program
on the "free" portion of the computer hard drives there --
preventing recovery of any files that had previously been
deleted through normal software commands.  Id. at 248-49.

Unbeknownst to Ahed, however, private investigators, hired by the plaintiff, had been watching his actions since the evening of August 17, when the complaints were filed.  They had observed him discarding the items, as described above, and collected them from the dumpster.  See Aff. of Tomas Romano (document # 14).

5.    On August 20, armed with affidavits from the investigators, iRobot's counsel filed for and received a temporary restraining order from the Alabama district court, which enjoined the defendants from further destroying evidence. On the afternoon of August 21, United States Marshals arrived at the Robotic FX offices to serve the TRO.  They were accompanied by plaintiff's counsel and computer forensic experts hired by iRobot, who were to perform the searches of the defendants' property.  Ahed did not mention his previous destruction of evidence to anyone present.  After the forensics experts searched the office, they -- the Marshals, Ahed, Hill, the forensic experts, and plaintiff's counsel -- proceeded to Hill's apartment.  Id. at 258-59.

Ahed and Hill arrived first.  They entered through the back door, as the Marshals and plaintiff's counsel approached the front.  Hill greeted them at the door, while Ahed remained in a rear bedroom.  Ahed noticed his laptop, still running and displaying a message stating that its data had been wholly

deleted through the use of the drive scrubber program.  Id. at 259-61; see Exh. 61 (photograph of laptop screen showing program).  Ahed unplugged the laptop, closed it, placed it in a case, and slid the case underneath the bed.  Tr. at 260-62.  Neither he nor Hill mentioned the presence of the laptop to the Marshals.  Id. at 262.  Ahed was clearly attempting to conceal the laptop from the search, but Ronald Weiss, one of the forensic computer experts, discovered the laptop a short while later.  See Tr. at 264.

### H.  **Army Sets Aside the Award**

On August 29, 2007, this action was removed by the defendant from Massachusetts state court to federal court.  On August 30, plaintiff moved for a preliminary injunction, and on September 20, following limited expedited discovery, this Court began its hearing.  On September 21, 2007, after the preliminary injunction hearings in this suit had already begun, iRobot lodged a bid protest with the Government Accountability Office ("GAO").

On October 23, the Army elected to "take corrective action" by setting aside the award of the contract to Robotic FX.  Letter from Joanne Byrd, Contracting Officer, Dep't of the Army, to Christine Choi, U.S. Army Legal Svcs. Agency ("Set-Aside Letter") (Oct. 23, 2007), Exh. to United States' Notice of Set Aside of Contract (document # 61).  It did so because

iRobot's protest, "though not clearly meritorious, raise[d]
questions regarding the award of [the] Contract . . . to
Robotic FX." <u>Id.</u>  In addition to setting aside the contract,
the Army will "[c]onduct a reassessment of Robotic FX's
responsibility to perform the xBot contract in light of
information that was made available . . . after award [of the
contract.]" <u>Id.</u>  If Robotic FX is found "not responsible," it
is possible that the contract will be awarded to iRobot
instead, as it was the next lowest bidder.  <u>See id.</u>  Due to the
Army's action, the GAO dismissed iRobot's bid protest as moot.
<u>See</u> Decision, <u>iRobot Corp.</u>, File Nos. B-310432, B-310432.2, B-
310432.3 (GAO Oct. 26, 2007) (Kepplinger, General Counsel),
Exh. to United States's Notice of Set Aside of Contract
(document # 61).[3]

## II.  <u>LEGAL STANDARDS</u>

This Court must weigh four factors in determining whether
to grant a preliminary injunction: (1) the plaintiff's
likelihood of success on the merits; (2) the potential for
irreparable harm to the plaintiffs in the absence of such an

---

[3] Before the Army's decision, both the defendants and the United States
questioned this Court's jurisdiction to issue a preliminary injunction,
characterizing the suit as a disguised bid protest that should have been
lodged in the Court of Federal Claims.  See Defs.' Mem. of Law Pursuant to the
Court's Order Sept. 24, 2007 Order (document # 41); United States's Br.
Regarding Jurisdiction of the Court of Federal Claims (document # 42).  While
the issue is now largely moot, since there are no proceedings in the Court of
Claims to which this Court could defer, the arguments retain relevance to the
exercise of the Court's discretion to enter a preliminary injunction.  The
arguments are consequently addressed below.  See <u>infra</u> Section IV.C.

injunction; (3) whether the balance of equities in issuing the
injunction favors the plaintiff; and (4) the effect the
injunction would have, if any, on the public interest.  <u>E.g.</u>,
<u>Jean v. Mass. State Police</u>, 492 F.3d 24, 26-27 (1st Cir. 2007).
The first factor is by far the most important.  <u>Id.</u>  The Court
will address it in Part III, below, then turn to the remaining
factors in Part IV.

In evaluating the merits, this Court applies Massachusetts
trade secret law, since this is a diversity case.[4]  <u>See</u> Mass.
Gen. Laws ch. 93, §§ 42, 42A; <u>id.</u> ch. 266, § 30(4) (defining
"trade secret" for purposes of ch. 93).  Under Massachusetts
law, a "trade secret" is "anything tangible or intangible or
electronically kept or stored, which constitutes, represents,
evidences or records a secret scientific, technical,
merchandising, production or management information, design,
process, procedure, formula, invention or improvement."  <u>Id.</u>
ch. 266, § 30(4).  For any trade secret that is "unlawfully
take[n]," the person who commits the taking is liable in tort
for up to double damages, regardless of the value of the

---

[4] iRobot does not specify in its complaint the grounds upon which it
bases its request for a preliminary injunction, but it seems clear that it is
for misappropriation of trade secrets.  <u>See</u> Mot. for Prelim. Inj. (document #
5) at 1.  The plaintiff's other causes of action -- breach of contract, breach
of implied covenants of good faith and fair dealing, unfair competition, and
computer fraud and abuse -- are all claims sounding in law, rather than in
equity.  Conversely, Massachusetts law also specifically provides for a suit
in equity over the alleged wrongful taking of a trade secret.  Mass. Gen. Laws
ch. 93, § 42A.  The Court therefore disregards the other causes of action for
purposes of the instant motion.

secret.  Id. ch. 93, § 42.  To make out such a claim, the
plaintiff must demonstrate: (1) that the information is, in
fact, a trade secret; (2) that the plaintiff took reasonable
steps to preserve the secrecy of the information; and (3) the
defendant used improper means to acquire the information.  See
Data General Corp. v. Grumman Systems Support Corp., 36 F.3d
1147, 1165 (1st Cir. 1994); J.T. Healy & Son, Inc. v. James A.
Murphy & Son, Inc., 357 Mass. 728, 737-39 (1970).

     As discussed below, in its filings iRobot outlined three
clusters of trade secrets that the Negotiator allegedly
infringes.  The defendants have raised questions as to whether
two of those clusters can constitute trade secrets at all:
disclosure of the mechanism in iRobot's published patent may
destroy the secrecy necessary for a trade secret claim even as
it protects intellectual property through a different process.
See Restatement (Second) of Unfair Competition § 39 cmt. f
(1995).  With respect to those two alleged secrets, and again
on a truncated record, the evidence is in equipoise. iRobot
cannot establish a reasonable likelihood of success on the
merits -- that the information is, in fact, a trade secret.
See Data General Corp., 36 F.3d at 1165.

     One of the trade secrets, however -- the PackBot's track
and how it is produced -- appears to meet all of the necessary
qualifications of a trade secret on this record.  While Ahed

claims that he developed the track independently, this Court
will not credit his testimony.  Consequently, the Court finds
that iRobot has demonstrated a reasonable likelihood of success
on the merits with respect to that particular aspect of the
Negotiator, as well as the development processes that enable it
to be manufactured.[5]

Moreover, the Court finds that the other factors in the
preliminary injunction calculus also militate for the issuance
of the injunction.  iRobot has sufficiently alleged permanent
and irreversible harm.  Allowing the Negotiator to be sold
would cause the plaintiff to irrevocably lose market share to
which it is entitled.  Moreover, although the defendants stand
to suffer similar harm if the injunction is issued, they suffer
that harm precisely because of the tortious conduct iRobot has
demonstrated a reasonable likelihood of proving.  Finally,
although the defendants and the United States have raised some
important concerns over harm to the public interest resulting
from the injunction, the public interest does not weigh against
the injunction.  Indeed, many of the concerns are mooted by the

---

[5] One might argue that the same reasoning -- the undermining of Ahed's
credibility -- also applies to the other two trade secrets iRobot has alleged.
However, for those allegations, defendant's chief rebuttal relied on patents,
which are publicly available documents, and admissions by Ohm that some of the
processes used in the alleged secrets are mechanically unremarkable.  The
patents, in particular, facially demonstrate the design and parts used in some
of the alleged trade secrets.  Conversely, for the track and the track
production processes, the publicly available documents are not sufficient to
undermine iRobot's allegations of a trade secret.

Army's decision to set aside the contract; others are relieved by the narrow scope of the injunction.

## III.  **IROBOT'S REASONABLE LIKELIHOOD OF SUCCESS ON THE MERITS ON THE TRADE SECRETS CLAIM [REDACTED IN PUBLIC DOCUMENT]**

Because this section extensively discusses iRobot's alleged trade secrets, and relies on testimony that occurred during the sealed portion of the hearing, it is redacted.

## IV.  **THE REMAINING PRELIMINARY INJUNCTION FACTORS**

While a reasonable likelihood of success on the merits is the dominant factor in the preliminary injunction inquiry, <u>Jean</u>, 492 F.3d at 26-27, it is not the only one.  This Court must also consider the potential for irreparable harm to the plaintiff; the balancing of the harms between the plaintiff and the defendants; and the public interest.  <u>Id.</u>  In this case, where the United States has sought to intervene on behalf of the military to weigh in on the question of the public interest, the other factors take on unusual cogency.

### A.   **The Potential for Irreparable Harm to the Plaintiffs**

iRobot's assertion of irreparable harm does not rest merely on the loss of a contract, even a major one.  That harm could be adequately recompensed through damages.  Rather, iRobot argues that they have lost a head start in the marketplace.  <u>See</u> Pl. PI Mem. at 31-32 (document # 12).  It is an acceptable ground for injunctive relief in the trade secrets context.  <u>See, e.g.</u>, <u>Analogic Corp. v. Data Translation, Inc.</u>,

371 Mass. 643, 648-49 (1976); Restatement (Second) of Unfair
Competition § 44 cmt. c.  iRobot also argues that the harm is
exacerbated here because there is a substantial first-mover
advantage: the company winning the initial contract with the
military will also enjoy subsequent contracts for spare robots,
parts, training, and so on.  Frost Aff. ¶ 28 (document # 15).
Moreover, according to Frost, the non-military market for
tactical robots is extremely limited.  Tr. at 289.

Defendants counter by arguing that, among other things,
the plaintiff unreasonably delayed by waiting almost two years
after learning of the Negotiator before filing suit, showing
that irreparable harm was hardly imminent.  Def. PI Mem. at 5
(document # 28).

But it is not clear that the plaintiff did delay more than
two years: iRobot first acquired a Negotiator in December 2006,
Tr. at 306, took it apart, and determined that it thought that
proprietary iRobot information was being used.  By February
2007, iRobot had sent a cease-and-desist letter to Robotic FX;
it filed suit six months later.  While the timing of iRobot's
suit does lead to the conclusion that they intended to prevent
Robotic FX from gaining the military contract, it was surely
within its rights to decide to do so only after realizing that
Robotic FX was, in fact, a serious competitor.

Moreover, the defendants argue that the plaintiff has already received the essential relief it seeks. As a result of the bid protest, the defendants were automatically ordered to suspend any performance on the military contract. Defs.' Mem. of Law Pursuant to the Court's September 24, 2007 Order ("Defs.' Jurisd. Mem."), at 2 & n.2 (document # 41). The Army's decision to set aside the contract, see Set-Aside Letter (document # 61), formalized and indefinitely extended the suspension. The defendants argue that the existence of the order renders moot the motion for a preliminary injunction.

The Court disagrees. The Army's set-aside is limited, by its terms, to the xBot contract. The preliminary injunction sought by iRobot, by contrast, would extend to all sales, not merely those to the military, and would also prevent further disclosure of any iRobot confidential information.

On balance, it seems clear that iRobot has sufficiently alleged irreparable harm to meet this factor.

**B.** **The Balancing of the Harms Between the Plaintiff and the Defendants**

The defendants contend that, should a preliminary injunction be entered, they stand to lose everything that iRobot stands to gain. See Def. PI Mem. at 8 (document # 28). The Court finds this concern to be overstated: a preliminary injunction, standing alone, would not necessarily result in the award of the contract to iRobot. Cf. Set-Aside Letter

-21-

(document # 61) (noting that the Army is undertaking a review
of Robotic FX to determine whether it is a "responsible
contractor," but not explaining the scope of the inquiry or the
relevance of the instant suit).  Moreover, the equitable force
of the defendants' argument is considerably diminished by the
Court's finding that the plaintiff is reasonably likely to show
that the defendants illicitly gained the opportunities they now
stand to lose.

    The defendants further argue that an injunction would
prevent them from fulfilling other open contracts.  Def. PI
Mem. at 8-9.  This concern is best addressed by referring to
the scope of the injunction: the injunction focuses on the
Negotiator's alleged use of particular trade secrets, not to
the Negotiator as a whole, let alone the propriety of Robotic
FX's other contracts.  Nor will the injunction, as issued,
interfere with service obligations, like the repair of existing
tracks.  To be sure, Robotic FX has entered into a letter of
intent to be sold to a major defense contractor.  Id. at 8.
Presumably, should that sale fall through, the consequences to
Robotic FX may be dire.  Again, however, iRobot has shown, at
least at this stage, that Robotic FX has only been placed in
that position by dint of its use of iRobot's proprietary
information.

On the whole, the Court finds that the balancing of the equities favors issuing a preliminary injunction.

### C.  __The Public Interest__

The thorniest of the preliminary injunction factors is the question of the public interest; the government's statements in support of the defendants give the Court pause.  The Court is well aware that the wars in Iraq and Afghanistan continue apace, and that either the PackBot or the Negotiator might staunch the flow of casualties from IEDs.  Moreover, it is emphatically not the province of this Court to second-guess a decision made by the military.  The Court will therefore tread cautiously in entering any relief that directly affects the military, and focus the scope of the injunction as narrowly as possible.

Several arguments raised by the defendants and the United States address whether the preliminary injunction would be in the public interest.  First, the defendants argue that the United States is an indispensable party to the litigation. Without resolving that issue at this stage, the Court certainly acknowledges the importance of the United States' interest in the issue.  It has participated as amicus in the preliminary injunction phase, and its positions have been seriously considered.  Second, both the defendants and the United States raised -- as a jurisdictional issue -- whether this Court could

issue an injunction pertaining to a government contract.  That contention is not necessarily mooted by the set-aside of the contract -- which is, after all, temporary.  Finally, there is the public interest represented by the military's ability to acquire functional robots as quickly as possible.

The Court will address the second and third arguments -- jurisdictional issues and the public interest -- in turn.

### D.    **The United States' Interest**

#### 1.    **Jurisdiction to Enter an Injunction Pertaining to a Government Contract**

Before the contract was set aside, both the government and the defendants contended that this Court lacked jurisdiction to issue a preliminary injunction impinging on a government procurement contract.  <u>See</u> Defs.' Jurisd. Mem. (document # 41); United States' Br. Regarding Jurisdiction of the Court of Federal Claims (document # 42).[6]  There is no longer a proceeding to which this Court could defer, but the possibility that the Army could re-award the contract to Robot FX means that these arguments continue to have force.

In a situation in which roughly identical facts were alleged, but the claim was one of patent or copyright, the

---

[6] According to the defendants and the government, the present suit is a disguised bid protest, for which jurisdiction lies solely in the United States Court of Federal Claims.  <u>See</u> Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, § 12(d), 110 Stat. 3870, 3875 (1996) (codified at 28 U.S.C. § 4191 note) (sunset provision for district court jurisdiction over bid protests).

existence of the military contract would arguably place
exclusive jurisdiction in the Court of Claims.  See 28 U.S.C. §
1498(a) ("Whenever an invention . . . covered by a patent of
the United States is used or manufactured by or for the United
States without license . . . the owner's remedy shall be by
action against the United States in the United States Court of
Federal Claims . . . ."); id. § 1498(b) ("[W]henever the
copyright in any work protected under the copyright laws of the
United States shall be infringed . . . by a contractor . . .
acting for the Government . . . the exclusive action which may
be brought for such infringement shall be an action by the
copyright owner against the United States in the Court of
Federal Claims"); see also Trojan, Inc. v. Shat-R-Shield, Inc.,
885 F.2d 854, 856 (Fed. Cir. 1989).  The defendants claim,
though with little elaboration, that even though § 1498 only
addresses, by its terms, patent and copyright law, trade
secrets should be read in, ejusdem generis.  Defs.' Jurisd.
Mem. at 4 (document # 41).  That is, the Court should exercise
its equitable discretion, in light of the purposes and language
of § 1498, not to issue an injunction.

     The Court disagrees.  First, in a case between private
parties, § 1498 is not jurisdictional, but the codification of
an affirmative defense.  Manville Sales Corp. v. Paramount
Sys., Inc., 917 F.2d 544, 554 (Fed. Cir. 1990) (citing Sperry

Gyroscope Co. v. Arma Engineering Co., 271 U.S. 232, 235-36
(1926)).  Second, and more importantly for weighing the
interest, the Court does not find § 1498 to be persuasive as a
reason to curtail the reach of its equitable power.  The
government and the defendants do not point to any language in
the statute or its history that Congress intended its terms to
extend to all intellectual property.  To the contrary, the
statute must be examined in light of its special, narrow
purpose:  Congress' consent to suits for patent and copyright
infringement by the United States.  See Airborne Data, Inc. v.
United States, 702 F.2d 1350, 1352 (Fed. Cir. 1983).  The
United States has particular power to channel redress in
copyright and patent because, unlike trade secrets, they are
intellectual property created by federal law.  In patent and
copyright, the rights-holder "takes his [exclusivity right]
from the United States subject to the government's eminent
domain rights to obtain what it needs . . . and to use the
same."  W.L. Gore & Assoc., Inc. v. Garlock, Inc., 842 F.2d
1275, 1283 (Fed. Cir. 1988).

Trade secrets, by contrast, are created and protected by
state law and the common law.  See, e.g., Mass. Gen. Laws ch.
93, §§ 42, 42A; id. ch. 266, § 30(4).  They are therefore much
more analogous to garden-variety physical property, also
created and protected by state law.  If the United States takes

trade secrets, as with any other property, the taking must be duly compensated.  See Ruckelshaus v. Monsanto Co., 467 U.S. 986 (1984); id at 1001-1004 (holding trade secrets to be property subject to takings law); id. at 1010-1014 (recognizing that under some circumstances, the government's use of trade secrets submitted in confidence can constitute a taking). Inclusion ejusdem generis of trade secrets in § 1498 would be inconsistent with the limited purposes of the statute and other jurisprudence regarding trade secrets.

Finally, the Court notes and acknowledges the fact that the Court of Federal Claims has exclusive jurisdiction over proceedings related to government contract bid protests.  The United States, in particular, urges that this Court "lacks authority to void Robotic FX's contract with the government." United States' Response to iRobot's Br. of Oct. 5, 2007 (document # 55) at 1.  The government's concern is largely, but not entirely, mooted by the set-aside of the contract.

In any case, the Court has no intention of "voiding the contract," including prospectively.  Rather, its equitable powers extend to stopping Robotic FX from behaving in a manner that infringes upon iRobot's trade secrets, including certain manufacturing processes.  That those manufacturing processes may create parts that are integral to the Negotiator (and thus to Robotic FX's performance of the contract) is an unhappy side

effect, but it does not directly affect the validity of the government contract.  (If Robotic FX were able to obtain the parts in another, valid way, it would still be able to perform.)  The Court has adequately taken into account these difficulties in its overall consideration of the public interest.  Indeed, that is a substantial part of the reason the injunction is tailored as narrowly as it is.

For these reasons, the Court finds that the presence of the government contract issue does not constrain its authority, either directly or by persuasion.

### 2.   The Importance of Obtaining Functioning Robots as Quickly as Possible

iRobot argues that the actual impact of a complete injunction against the production and sale of the Negotiator would be minimal, given that iRobot's PackBot is available for production, Tr. at 293-94, can perform all the same tasks, id. at 286-87, and will be available for the same price, id. at 295.  See Pl.'s Br. Responsive to the Court's Order of Sept. 24, 2007, at 16-17 (document # 51).  Moreover, the set-aside process explicitly notes the award of the contract to iRobot as a possibility.  See Set-Aside Letter (document # 61).  Indeed, both robots passed the technical tests of the government.

As such, the Court finds that the public interest in acquiring technically proficient robots as quickly as possible

will not be substantially harmed by the issuance of the
injunction.

## V.    <u>THE SCOPE OF THE INJUNCTION</u>

Carefully balancing these factors, including the
military's weighty objections, the Court concludes that a
narrow preliminary injunction is appropriate in this case.  An
injunction will issue with respect to some, but not all, of the
trade secrets alleged by iRobot.

Specifically, the Court will grant injunctive relief with
respect to the alleged trade secrets described above in Part
III.C, but not with respect to the alleged trade secrets
described above in Parts III.A and III.B.  On this record,
because of showings by the defendants regarding disclosure in
patents, combined with the ordinary nature of some of the
engineering processes, the Court finds that the plaintiff has
failed to demonstrate a reasonable likelihood of success on the
merits.  Significantly, these flaws were demonstrated not
through Ahed's testimony, but through the cross-examinations of
iRobot's witnesses Frost and Ohm.  Where Ahed's testimony was
critical, on the issue of the trade secret described in III.C,
the Court finds him not to be a credible witness, and
accordingly finds that the plaintiff has demonstrated a
reasonable likelihood of success on the merits.

The Court realizes that the injunction, as issued, is unlikely to satisfy either party: it is narrower than the plaintiff desires, and deeper than the defendants wish.  The Court therefore will encourage as expeditious a trial schedule as possible.  **This case will be tried no later than Monday, April 7, 2008.**

The precise terms of the injunction follow in a separate Order, which shall be issued under seal because it narrowly specifies the trade secrets not to be infringed.

## VI.  <u>CONCLUSION</u>

For the reasons set forth above, the Court will **GRANT IN PART** the Plaintiff's Motion for a Preliminary Injunction (document # 5), with such terms as shall follow in a separate Order.  **A trial date of no later than Monday, April 7, 2008, will be set.  The Clerk shall set a pre-trial conference for March 26, 2008.  The parties are further ORDERED to submit a proposed discovery schedule by November 15, 2007.**


SO ORDERED.

Date:  November 2, 2007         /s/Nancy Gertner
                                **NANCY GERTNER, U.S.D.C.**


-30-